# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

MICHAEL KENNEDY
    *Plaintiff*,

v.

SUPREME FOREST PRODUCTS, INC.,
    *Defendant*.

No. 3:14-cv-01851 (JAM)

## RULING ON POST-TRIAL MOTIONS

Plaintiff Michael Kennedy filed suit against defendant Supreme Forest Products, Inc., alleging that it violated the federal Surface Transportation Assistance Act, 49 U.S.C. § 31105, by terminating his employment for refusing to drive trucks of mulch that were loaded beyond the federal weight limit. After a five-day trial, a jury found in favor of plaintiff and awarded $11,900 in compensatory damages and $425,000 in punitive damages. Defendant now moves for judgment as a matter of law or for a new trial, while plaintiff in turn moves for an award of attorney's fees and costs. For the reasons below, I will deny defendant's motions except that I will reduce the punitive damages award to the statutory limit $250,000. I will otherwise grant in part and deny in part plaintiff's motion for attorney's fees and costs.

## BACKGROUND

The facts set forth below are based on evidence introduced at trial and presented in the light most favorable to the jury's verdict in plaintiff's favor. Defendant is a company that was in the business of selling mulch and similar earth-and-forest-related products. Plaintiff worked for defendant as a truck driver for about 12 years to deliver loads of the company's product to customers.

The Surface Transportation Assistance Act ("STAA") protects employees from retaliation by their employers on account of a complaint of a violation of federal safety

1

regulations in the transportation industry. The Act provides in relevant part that a person may not discharge an employee who refuses to operate a vehicle because the operation violates a federal safety regulation. 49 U.S.C. § 31105(a)(1)(B)(i). Plaintiff alleged that he was discharged on April 3, 2014, after he refused to operate trucks that were loaded in violation of a federal safety regulation that limits the weight of trucks on interstate highways to no more than 80,000 pounds. *See* 23 C.F.R. § 658.17(b).

Plaintiff's trial evidence showed that for many months prior to his discharge the company routinely loaded its trucks in excess of 80,000 pounds. In 2013, defendant hired Martin Paganini as general manager to help the company improve financially after a period of low sales. Until Paganini's arrival, defendant had generally loaded its delivery trucks with not more than 60 yards of mulch at a time. With Paganini's arrival, however, the company began loading trucks with more mulch, frequently up to 70 yards. Loading trucks with more mulch was more profitable for the company because it decreased the total number of loads necessary to drive to fulfill orders.

The evidence showed a 70-yard load of mulch would violate the federal weight limit. Plaintiff himself testified that based on his lengthy experience and on the basis of his truck's mechanical suspension gauge, a load of 70 yards of mulch would put a truck over 80,000 pounds. Similarly, Walter Whitbeck—a former company employee who had loaded trucks for many years—also testified that 70 yards of mulch would weigh over 80,000 pounds.

Plaintiff covertly recorded Paganini making statements that a jury could have reasonably understood to mean that he not only knew but also required that the company's trucks haul loads over the legal weight limit. A covert tape recording of one of the company's meetings included the voice of plaintiff and another employee who raised concerns about the truck loads being

overweight. Paganini said: "There's going to be times that – we all know that we are heavy haulers, we're going to haul, you know, 86, 85, you know." Doc. #77-11 at 38. Plaintiff voiced his concerns to Paganini about how an overweight load "changes the whole dynamics of your piece of equipment," and how "you're constantly biting your nails all day long" with an overweight load. *Id.* at 42. Plaintiff asked: "[I]f I get pulled over and I go to jail, are you going to bail me out?" *Id.* at 43. Paganini replied: "Absolutely. . . . [N]ow, listen, this discussion can open a can of worms." *Ibid.*

Another employee said that it was "gross negligence" to haul a load of more than 80,000 pounds. *Ibid.* Paganini responded:

> Listen, we are heavy – we're haul heavy over here. We've done it that way for the last 20 to 30 years, and it's not going to be asked of you to do it every day, every load, but there are going to be times that you're going to haul heavy.

*Ibid.* Paganini went on to explain how the company had lost money before by hauling loads that were too light and that it had to haul heavy loads in order to make money:

> Nobody – nobody has ever sat down to figure out where our margins of profit were, and so I did. I figured it out as far as where the weight was, where the profits were, and what we need to haul in order to s[t]ay solvent as a company.

*Id.* at 44.

Beyond these highly inculpatory statements of Paganini, there was additional documentary evidence that a reasonable jury could have found to be conclusive corroboration of plaintiff's claim. The company had its own scale that was used to weigh its trucks, and hundreds of weight tickets from the company's own scale showed overweight loads for defendant's trucks from December 2013 into April 2014. Doc. #77-14; Doc. #209 at 52.

Defendant's own website corroborated plaintiff's claim that a 70-yard load of mulch would put a truck in violation of federal weight limits. The company's website listed a range of

3

weights for mulch—between 800 to 1,000 pounds per yard, depending on the mulch's moisture content. Assuming a 70-yard load at the very low end of the company's weight-per-yard estimate (800 pounds per yard), this would mean that a normally sized, 35,000-pound delivery truck with a 70-yard load would weigh 91,000 pounds—far in excess of the federal weight limit.

The complaint in this case focused on April 3, 2014. Plaintiff testified that on that day he was asked to drive two loads of 70 yards of mulch, and that after refusing to drive both loads, he was fired. To corroborate his claim that the particular truck that day was overweight, plaintiff submitted a "load manifest" dated April 3, 2014, which indicated a load of 70 yards of premium bark mulch to be driven from Southington, Connecticut to Hartford, Connecticut. Doc. #205 at 222-24. He testified that "[t]he weights were getting out of control," and "by increasing 10 more yards of premium bark mulch [it] was going to be extremely heavy," and "I didn't want no part of it." Doc. #205 at 229.

Plaintiff submitted another covert audio recording of a conversation between him and Paganini that day in which he told Paganani that he refused to drive because he was being asked to drive a truck that was overweight. Paganini told plaintiff to "go home . . . because I'm just not going to deal with the chicken shit right now." Doc. #77-11 at 6–8. Paganini then told plaintiff that human resources would be in touch "within a day or so." *Id.* at 10. But nobody got in touch with plaintiff for several days. On April 7, plaintiff contacted defendant's human resources department, which informed him that it was sending him a pink slip. The jury could reasonably have concluded from this course of conduct that defendant discharged plaintiff because of his refusal to haul overweight loads of mulch.

4

**DISCUSSION**

Under Rule 50, a motion for judgment as a matter of law will be granted only if "a reasonable jury [did] not have a legally sufficient evidentiary basis to find for the party" that prevailed at trial. Fed. R. Civ. P. 50(a)(1). A party seeking judgment on this basis bears a "heavy burden," and will succeed only if "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 52 (2d Cir. 2014). I must view the evidence "in the light most favorable to the party against whom the motion was made and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Harris v. O'Hare*, 770 F.3d 224, 231 (2d Cir. 2014), *as amended* (Nov. 24, 2014). Moreover, notwithstanding a movant's reliance on trial evidence that favored the movant's version of events, a court considering a Rule 50 motion "must disregard all evidence favorable to the moving party that the jury is not required to believe." *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).

Rule 59(a) of the Federal Rules of Civil Procedure provides that the Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." The standard for granting a motion for a new trial is lower than the standard for granting a Rule 50 motion—a judge "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (citation omitted). Still, the Second Circuit has emphasized "the high degree of deference [that should be] accorded to the jury's

evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency." *Ibid.*

Nor is a motion for a new trial "a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). The Court may only grant a motion for new trial "if the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice," or "if substantial errors were made in admitting or excluding evidence." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014).

### *Interstate Highway Requirement*

As noted above, plaintiff's claim arises under the Surface Transportation Assistance Act ("STAA"), 49 U.S.C. § 31105(a)(1)(B)(i), a statute that prohibits an employer from discharging an employee because of the employee's refusal to operate a vehicle in a manner that would violate a federal vehicle safety regulation.[1] The safety regulation at issue here is 23 C.F.R. § 658.17, which in relevant part sets a maximum gross vehicle weight of 80,000 pounds for vehicles on the interstate highways.

The Second Circuit has described the aims of Congress when it enacted the STAA. "Congress sought to combat the increasing number of deaths, injuries, and property damage resulting from vehicle accidents in the interstate trucking industry," and "noncompliance with safety regulations in the transportation industry had become so common that Congress recognized the need to assure that employees are not forced to drive unsafe vehicles or commit

---

[1] The statute provides in relevant part that "[a] person may not discharge an employee . . . because—(B) the employee refuses to operate a motor vehicle because—(1) the operation violates a regulation, standard, or order of the United States related to commercial motor vehicle safety, health, or security." 49 U.S.C. § 31015(a). Although the statute is phrased in the present tense (that "the operation *violates* a regulation"), it applies even when the operation of a motor vehicle "would" violate a highway safety regulation. *See Koch Foods, Inc. v. Sec'y, U.S. Dep't of Labor*, 712 F.3d 476, 486 (11th Cir. 2013); *Harrison v. Admin. Review Bd. of U.S. Dep't of Labor*, 390 F.3d 752, 757 n.1 (2d Cir. 2004).

unsafe acts, and to provide protection for those employees who are discharged or discriminated against for exercising their rights and responsibilities." *Yellow Freight Sys., Inc. v. Reich*, 38 F.3d 76, 81–82 (2d Cir. 1994) (internal citations and quotation marks omitted); *see also Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 258 (1987) ("Congress recognized that employees in the transportation industry are often best able to detect safety violations and yet, because they may be threatened with discharge for cooperating with enforcement agencies, they need express protection against retaliation.").

Defendant argues that the evidence was not sufficient for the jury to conclude that on April 3, 2014, plaintiff would have driven either one of the overweight loads of mulch on an interstate highway rather than exclusively on other kinds of roads.[2] I do not agree. Although plaintiff did not testify about the specific route that he would have taken had he not refused to drive the overweight loads in question, the trial evidence showed that both loads to be hauled that day originated at defendant's lot in Southington, Connecticut. The first load was destined for Bridgeport, Connecticut, and the second load was destined for Hartford, Connecticut. The city of Bridgeport is about 40 miles from Southington, and the city of Hartford is about 20 miles from Southington. *See United States v. Hernandez-Fundora*, 58 F.3d 802, 811 (2d Cir. 1995) ("Geography has long been peculiarly susceptible to judicial notice for the obvious reason that geographic locations are facts which are not generally controversial."). There is no reason to

---

[2] Defendant does not dispute that the Court properly instructed the jury that plaintiff had to prove that defendant discharged plaintiff because he refused to operate a vehicle "in violation of the federal regulation that prohibits the operation of a motor vehicle *on the federal interstate highway system* that exceeds a total weight of 80,000 pounds." Doc. #209 at 18 (emphasis added); *see also id.* at 20 (instructing jury that plaintiff must prove that he refused to drive "because his operation of the vehicle to transport the load of mulch assigned to him would have violated the federal regulation that prohibits the operation of a vehicle that weighs more than 80,000 on a federal interstate highway"). Nor does he dispute that—despite the arguments of the company's counsel that there was insufficient evidence that plaintiff would have driven the overweight loads on an interstate highway (Doc. #209 at 99-100)—the jury rendered specific findings concluding that plaintiff had indeed proven the interstate highway requirement. *See* Doc. #164 (jury verdict form).

7

suppose that the jury—which was drawn from south-central Connecticut—would not have been familiar with these locations and distances as well.

The jury reasonably could have concluded by a preponderance of the evidence that plaintiff would have driven either or both of the truckloads on an interstate highway. Southington and Hartford are directly connected by Interstate 84. Although Southington and Bridgeport do not have a direct interstate connection, a reasonable jury could have concluded that plaintiff would have driven at least some of the 40-mile-long route on any one of the several interstate highways (I-84, I-691, or I-91) that lie between Southington and Bridgeport.

In addition, the jury could have drawn upon its common sense to conclude that it was more likely than not that a commercial driver would use an interstate highway because traffic moves more quickly than on other roads and because of the specific benefits of wider lanes and turning distances for a large load truck of the type that plaintiff was asked to drive. Indeed, the jury could have reasoned that all these roadway realities were well known to defendant itself in that Paganini never suggested to plaintiff that he avoid any legal concerns by using local roadways after plaintiff complained about being asked to haul overweight loads. *Cf. United States v. Rosario*, 48 F. App'x 12, 13-14 (2d Cir. 2002) (rejecting criminal defendant's challenge to sufficiency of evidence of federal interstate nexus where witness testified that store that was robbed sold "imported" beer, such that "the jury could have concluded that that the witness understood the question to mean 'imported' from another country," and "[i]f the defense doubted this, counsel could have explored the issue on cross-examination," and where testimony showed that store also sold cigarettes such that "[w]ith a rudimentary knowledge of agriculture, the jury could conclude that the tobacco in cigarettes is grown outside New York").

A jury may rely on circumstantial evidence to find facts at trial, and on post-trial review the winning party is entitled to the "benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Harris*, 770 F.3d at 231. In addition, "jurors are permitted and expected to bring to their deliberations common knowledge drawn from their life experiences." *United States v. Tin Yat Chin*, 275 F. Supp. 2d 382, 384 (E.D.N.Y. 2003).

I will credit the jury's experience and common sense here. The evidence was enough for a jury to conclude by a preponderance of the evidence that plaintiff would have used at least one interstate highway for the loads that he refused to drive on April 3, 2014. Accordingly, I will deny defendant's motion for a new trial pursuant to Rule 50.

Even examining defendant's arguments under the more relaxed review standards of a motion for new trial pursuant to Rule 59, I conclude that the jury's result was neither substantially erroneous nor a miscarriage of justice. It was reasonable for the jury to conclude—as it did—that plaintiff would have used an interstate highway to drive the loads that he refused to drive on April 3, 2014.

### *Punitive Damages*

Defendant also moves for judgment as a matter of law and/or a new trial on the issue of punitive damages. The STAA was amended in 2007 to provide for the award of punitive damages of up to $250,000 in addition to compensatory damages. *See* 49 U.S.C. § 31105(b)(3)(C); *Elbert v. True Value Co.*, 550 F.3d 690, 691–92 (8th Cir. 2008). In general, punitive damages are available when "the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). Punitive damages are awarded for "conduct that is outrageous, because of the

defendant's evil motive or his reckless indifference to the rights of others." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 538 (1999) (quoting Restatement (Second) of Torts § 908(2) (1979)).

Defendant argues that there was no evidence from which a reasonable jury could infer that it was malicious, wanton, or reckless. I do not agree. The evidence was easily sufficient to show defendant's long-running and greed-driven disregard for safety and the law. The jury heard defendant's general manager discussing on tape the need to boost profit margins and to do so by hauling heavy loads. As if these incriminating statements weren't enough, the jury could easily have credited the testimony of plaintiff and Walter Whitbeck about defendant's overloading practices, especially in light of the scores of weight tickets from defendant's own scale equipment and in light of the weight calculations of mulch that were drawn from defendant's own website.

Moreover, the jury reasonably could have concluded that defendant acted equally maliciously or recklessly when it decided to terminate plaintiff's long-tenured employment after he was brave enough to raise concerns about defendant's illegal practices. When plaintiff refused to drive overweight loads, Paganini told him that there's "a decision that we need to do. Just to cut through the chicken shit that's going on . . . you're going home because I'm just not going to deal with the chicken shit right now," and he said plaintiff couldn't "come up and back Kevin Boucher [company owner] or Mart[y] Paganini in the corner like this." Doc. #77-11 at 7–8.

After plaintiff told Paganini that he understood that he had just been fired for refusing to violate the law, Paganini then said that "I'm not going to sit here and incriminate myself or allow you to take and back me in a corner." *Id.* at 9. Days later plaintiff received his pink slip. Paganini's words and actions were enough for a jury to conclude that defendant acted

maliciously, wantonly, and in reckless disregard for the law as well as for the rights of plaintiff. The jury was well within its authority to award punitive damages.

Defendant further argues that the jury's award of punitive damages in the amount of $455,000 exceeds the statutory limit of $250,000. Plaintiff agrees, and therefore I will reduce the punitive damages award to $250,000.

Defendant next argues that even this reduced punitive damages award of $250,000 is unconstitutionally excessive. I do not agree. As the Second Circuit has observed, "[p]unitive damages 'are given to the plaintiff over and above the full compensation for the injuries, for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example.'" *Stampf*, 761 F.3d at 209 (quoting Prosser and Keeton on the Law of Torts § 2, at 9 (5th ed. 1984)).

The United States Constitution imposes a substantive limit on the size of a punitive damages award, and I must consider three "guideposts" in determining the propriety of a punitive damages award: (1) the degree of reprehensibility of the defendant's conduct, (2) the relationship of the punitive damages award to the compensatory damages award, and (3) criminal and civil penalties imposed by the state's law for the misconduct in question. *See ibid.* (citing *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996)).

As to the first guidepost (reprehensibility), a reasonable jury could have concluded that defendant willfully fired plaintiff for refusing to go along with its long-running, profit-driven policy to violate federal transportation safety law by overloading its trucks. The first factor weighs strongly in favor of a sizeable punitive damages award. *See Payne v. Jones*, 711 F.3d 85, 101 (2d Cir. 2013) (noting that "[t]he *Gore* decision described the degree of reprehensibility of the defendant's misconduct as '[p]erhaps the most important indicium of the reasonableness of a

punitive damages award,'" and that "[t]his guidepost is particularly important and useful because punitive damages are intended to punish, and the severity of punishment, as in the case of criminal punishments, should vary with the degree of reprehensibility of the conduct being punished.").

As for the second guidepost (disparity), there is an approximate 21-to-1 ratio between the reduced punitive damages award of $250,000 and plaintiff's compensatory damages of $11,900. This ratio falls far short of the "breathtaking" ratio of 500-to-1 that was struck down in *Gore*, 517 U.S. at 583, or the 145-to-1 ratio that was struck down in *State Farm*, 538 U.S. at 425.

In any event, the second guidepost directs courts to consider the "actual *or potential* harm" suffered by a plaintiff, *id.* at 418 (emphasis added), and here it was no more than happenstance that plaintiff's compensatory damages were small because he had quick success in landing new employment. As the Second Circuit has noted, "in cases of very small injury but very reprehensible conduct, the appropriate ratios can be very high." *Payne*, 711 F.3d at 102. Plaintiff could just as well have had many tens of thousands of dollars in damages if he had not successfully found new employment as he did. Indeed, had plaintiff lost just a few more months looking for a new job, his compensatory damages would have topped $25,000, and the punitive/compensatory ratio in this case would have dropped into the single digits. *See State Farm*, 538 U.S. at 425 ("Single-digit multipliers are more likely to comport with due process . . . ."). I don't see why the Constitution should be used to disadvantage a plaintiff because his job skills are in high demand and because he successfully mitigates his damages.

As to the third guidepost (civil and criminal penalty comparators), a punitive damages award of $250,000 is well within the range of damages in retaliatory termination cases. *See, e.g., Cruz v. Henry Modell & Co., Inc.*, 2008 WL 905356, at *10 (E.D.N.Y. 2008) (collecting

retaliatory discharge cases and noting range of punitive damages from $25,000 to $1.25 million). Additionally, an award of $250,000 in punitive damages is explicitly authorized by the STAA, and a federal statutory cap is a useful guide for what may be an appropriate civil penalty for comparable misconduct.

Congress has seen fit to limit the award of punitive damages, and the Court is hesitant to impose additional constitutional limits on awards that are within the scope of what Congress authorized. "Only where an award would shock the judicial conscience and constitute a denial of justice, for example because it would result in financial ruin of the defendant or constitute a disproportionately large percentage of a defendant's net worth and thereby violate due process, should the court reduce an award of punitive damages to below the appropriate [statutory] cap." *Luciano v. Olsten Corp.*, 110 F.3d 210, 221 (2d Cir. 1997).

Defendant cites *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 382 (D. Conn. 2016), for the proposition that "cases upholding punitive damage awards of $200,000 or more generally involve discriminatory or retaliatory termination resulting in severe financial vulnerability to plaintiff, repeated incidents of misconduct over a significant period of time, repeated failures to address complaints of discrimination, and/or deceit." *Id.* at 382. While it is true that plaintiff did not suffer great financial losses from being unlawfully discharged, the record otherwise suggests that defendant violated federal weight regulations scores of times over many months and shrugged off employee complaints to the detriment of safety and the law. Defendant cites other case comparators that bear little resemblance to the facts of this case involving a corporate defendant who fired an employee to perpetuate a long-running pattern of willful federal safety violations. *See Payne*, 711 F.3d at 105 (noting that courts may look to awards by other courts but that "[t]he undertaking is precarious because the factual differences between cases can make it

13

difficult to draw useful comparisons"). All in all, I conclude that a punitive damages award of $250,000 does not exceed the limits of the Constitution.

*Attorney's Fees and Costs*

Plaintiff moves for an award of litigation costs in the amount of $11,932.74 and attorney's fees in the amount of $176,987.50. The STAA permits the award of "reasonable attorney fees" to a person wronged by a violation of the statute's employee-protection provisions. 49 U.S.C. § 31105(b)(3)(A)(iii). While the STAA only explicitly discusses the award of fees by the Secretary of Labor during the administrative review stage of a plaintiff's complaint, *see ibid.*, defendant does not dispute that this Court has the authority to order a fee award as well. Doc. #191 at 2.

Furthermore, although defendant argues that the decision to award fees is discretionary rather than mandatory, it does not provide any reasons why the Court should not exercise its discretion to award fees here. I conclude that an award of attorney's fees is reasonable in this case based on plaintiff's success on the merits of the claim, defendant's evident ability to satisfy a fee award, the deterrence value of a fee award, and the broader social importance of the enforcement of anti-retaliation provisions designed to protect those who stand up against violations of public safety regulations. *See* Doc. #176-1 at 6-7 (defendant's disclosure of $7 million estimated revenue in 2017 and assurance that it is "financially secure"); *cf. Donachie v. Liberty Life Assur. Co. of Boston*, 745 F.3d 41, 46 (2d Cir. 2014) (discussing so-called *Chambless* factors to consider in awarding discretionary attorney's fees under ERISA); *Green v. Torres*, 361 F.3d 96, 100 (2d Cir. 2004) (noting that attorney's fees are awarded in civil rights statutes "to encourage private enforcement . . . to the benefit of the public as a whole.").

When deciding whether to award attorney's fees, a court must determine a presumptively reasonable fee, based on a reasonable hourly rate and the number of reasonably expended hours. *See, e.g.*, *Bergerson v. New York State Office of Mental Health, Cent. New York Psychiatric Ctr.*, 652 F.3d 277, 289–90 (2d Cir. 2011). To determine the reasonable number of hours and whether the requested compensable hours should be subject to reduction, the Court also considers "the degree of success obtained by the plaintiff," *Barfield v. New York City Health & Hospitals Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (internal quotation marks and citation omitted), as well as the following factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 415 (2d Cir. 1989); *see also McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 415 (2d Cir. 2010) (same). I have considered all of these factors and will address in this ruling only those objections raised by defendant.

Defendant objects to plaintiff's fee request on a variety of grounds. First, defendant argues that the hourly rates plaintiff claims for his attorneys are too high. Plaintiff seeks $450 per hour for Attorney Cicchiello, a partner at the firm of Cicchiello & Cicchiello with 12 years of legal experience; $375.00 per hour for Attorney Reilly, an associate at the same firm with roughly six years of legal experience; and $325 per hour for Attorney Paradisi, another associate at the firm with roughly six years of legal experience.

"It is plaintiffs' burden to establish with satisfactory evidence—in addition to the attorney's own affidavits—why their requested fee is appropriate." *LV v. New York City Dept. of Educ.*, 700 F. Supp. 2d 510, 513 (S.D.N.Y. 2010) (quoting *Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1059 (2d Cir. 1989)) (internal quotation marks omitted). Aside from their own affidavits and time sheets, plaintiffs have also provided citations to several cases discussing reasonable rates within the District of Connecticut over the last seven years. Doc. #174-1 at 14–15.

To determine whether a requested hourly rate is reasonable, courts may take judicial notice of "the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district." *KX Tech LLC v. Dilmen LLC*, 2017 WL 2798248, at *9 (D. Conn. 2017). Based in part on Judge Merriam's survey of recent cases earlier this year in *KX Tech*, I conclude that plaintiff's requested rates are unreasonably high. *See ibid.* (collecting cases and stating that "[c]ourts in this district have recently awarded between $225 and $275 for experienced associates."). Although attorneys Cicchiello and Reilly have pointed to considerable accomplishments in their personal records, their requested fees are equal to or higher than this Court has recently approved for many attorneys of equal or greater experience and accomplishment. *See ibid.*; *see also Crawford v. City of New London*, 2015 WL 1125491, at *2–3 (D. Conn. 2015) (finding $450 per hour to be an excessive rate for two partners with over thirty years of experience, and approving $250 per hour for an associate with eight years of litigation experience after two years as a law clerk); *Jaeger v. Cellco Partnership*, 2015 WL 1867661, at *3-4 (D. Conn. 2015) (approving fee request of $230 per hour for associate with five years of experience and $425 per hour for partner with twenty years of experience). I will therefore

reduce their requested fees by 20%, corresponding to an hourly rate of $360 for Attorney Cicchiello, $300 for Attorney Reilly, and $260 for Attorney Paradisi.

Second, defendant argues that plaintiff should not be awarded attorney's fees and costs for time spent on litigation against Supreme Industries, Inc., a former co-defendant who plaintiff sought to recover from but who was subsequently dismissed during trial. But "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," including "all hours reasonably expended on the litigation," even if "plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). Where a plaintiff's claims "involve a common core of facts . . . [a]ttorney's fees may be awarded for unsuccessful claims as well as successful ones." *Green*, 361 F.3d at 98. Plaintiff's claims against defendant and Supreme Industries, Inc., were certainly based on a common core of facts, and hours spent pursuing the claim against Supreme Industries were reasonably expended in the course of plaintiff's ultimately successful litigation.

Third, defendant argues that plaintiff should not be awarded fees for litigating the case on behalf of Ferrell Welch, a former plaintiff in this case who was dismissed at summary judgment. I agree that plaintiff should not be awarded attorney's fees for effort expended solely on behalf of Welch's unsuccessful claim. *See, e.g.*, *Dancy v. McGinley*, 141 F. Supp. 3d 231, 240 (S.D.N.Y. 2015) (reducing fees for work that "pertained solely" to the claims of an unsuccessful plaintiff.). But plaintiff has, appropriately, not sought reimbursement for any time related solely to Welch's case. I decline to reduce the fee award for items where counsel spent time on behalf of both plaintiffs. *See id.* (no reduction where time spent on two plaintiffs' claims equally necessary for each one).

Fourth, Defendant argues that plaintiff should not be awarded fees or costs for the time expended in defending *Supreme Forest Prods., Inc. v. Michael Kennedy and Ferrell Welch*, No. 3:16-cv-00054 (JAM), a separate lawsuit that plaintiff has listed as a "counterclaim" in its timesheets. I agree. Defendant's lawsuit against plaintiff is a separate matter that plaintiff never requested be joined with this case. Plaintiff's reply to defendant's argument does not cite a single case in which attorney's fees were awarded in one case for time spent litigating another case, and I see no reason to do so here. I therefore deny plaintiff's motion with respect to each item labeled "counterclaim" on the timesheets it has submitted as well as on its accounting of costs.

Fifth, defendant argues that plaintiff should not be awarded time expended defending against defendant's motion for sanctions, as that motion "was necessary solely because of Plaintiff's discovery misconduct." Doc. #191 at 5. I agree. *See* Ruling on Pending Motions Re Audio Recordings and Photographs, Doc. #151 at 8–9. Plaintiff's violation of discovery requirements should not be rewarded with attorney's fees.

Sixth, defendant argues that plaintiff's submissions regarding attorney's billing records "lack sufficient detail" and demonstrate "block billing practices." Doc. #191 at 5. Having reviewed the entries on plaintiff's timesheet, I find them to be reasonably specific. I have no concerns about the accuracy of the billing entries, and I am not concerned that they have been inflated beyond hours actually worked by plaintiff's attorneys.

Finally, defendant argues that a variety of specific items on plaintiff's attorneys' timesheets are unnecessary, unreasonable, duplicative, or too vague, and therefore not entitled to reimbursement. Doc. #191 at 23–34. Although defendant's list is overinclusive, I agree that plaintiff has listed two tasks that could have been handled by a paralegal or legal assistant and so are unreasonable for reimbursement at an attorney's rate: first, receiving and filing a waiver of

service form, and second, drafting and filing certain motions for extension of time. Defendant is also correct that costs associated with arranging for and traveling to a deposition or trial are not taxable as costs under D. Conn. L. Civ. R. 54(c)(7).

Defendant is also correct that plaintiff has not submitted the necessary documentation to be reimbursed for hiring a private process server under Local Rule 54(c)(1). I therefore deny plaintiff's motion as to this item, totaling $125, subject to reconsideration if plaintiff submits adequate documentation no more than 7 days from the date of this ruling.

Plaintiff's motion is granted with respect to the remaining items, which are reasonable when considered in light of the factors listed above. *See McDaniel*, 595 F.3d at 415.

In sum, I largely grant plaintiff's motion for attorney's fees, subject to the foregoing reductions. I will calculate the award as follows: 408 hours billed by Attorney Reilly, less 0.25 hours for receipt and filing of waiver of service, less 2.5 hours for preparing and filing motions for extension of time, less 19.5 hours for time spent on *Supreme Forest Prods., Inc. v. Michael Kennedy and Ferrell Welch*, No. 3:16-cv-00054 (JAM), less 18.5 hours for time spent on work subject to defendant's motion for sanctions, totaling of 367.25 hours, multiplied by the reduced rate of $300/hour, totaling $110,175; 48.25 hours billed by Attorney Cicchiello, less 4.25 hours for time spent on work subject to defendant's motion for sanctions, totaling 44 hours, multiplied by the reduced rate of $360/hour, totaling $15,840; 7 hours billed by Attorney Paradisi, multiplied by the reduced rate of $260/hour, totaling $1,820. The sum of the fees of each attorney is $127,835. Plaintiff is entitled to an award for costs of $11,932.74, less $536.02 in travel-related expenses, less $125 in private process server expenses, totaling $11,271.72. This results in a total award of $139,106.72.

**CONCLUSION**

Defendant's motions for judgment as a matter of law and/or for a new trial (Docs. #156, #175) are GRANTED in part and DENIED in part. The motions are DENIED except to the extent that the punitive damages award shall be reduced to $250,000. Plaintiff's motion for costs and fees (Doc. #174) is GRANTED in part and DENIED in part. Defendant shall pay plaintiff costs and fees in the amount of $139,106.72. The Clerk of Court shall enter an amended judgment reducing the punitive damages award to $250,000 and adding the Court's award of $127,835 in attorney's fees and $11,271.72 in costs.

It is so ordered.

Dated at New Haven, Connecticut, this 15th day of December 2017.

    /s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge